Osgood *v.* Abbott.

JAMES R. OSGOOD & others *vs.* WILLIAM H. ABBOTT & another.

*Condition subsequent—breach of—entry for forfeiture—by whom.*
*Estoppel—who can assert.*

Where, "in consideration of having a meeting-house erected and continued upon it," the owner of a certain lot of land duly executed and delivered to the "proprietors of the South Chapel, in Fryeburg," a deed thereof, with the stipulation therein that the "lot being given for a meeting-house lot, is to revert to me, unless it should be improved for that purpose," *habendum* "to the said proprietors and their successors forever, provided it be improved for the above purpose,"—an estate in freehold upon condition subsequent passed.

What facts fall short of constituting a breach of such condition.

Notwithstanding the breach of such condition, the estate will continue in the grantee until defeated by an actual entry made for the purpose of claiming a forfeiture by some one having the right so to do.

The heirs of the grantor, after the death of the latter, and after breach, may make such entry.

What facts fall short of constituting such an entry.

In February, 1845, the plaintiffs' father with others, having undertaken to organize themselves into a corporation, under the name of the "Proprietors of the South Chapel in Fryeburg," for the purpose of procuring a site and erecting thereon a meeting-house, and owning, managing, and disposing of the pews therein, signed, with his associates, a subscription paper, wherein it was stipulated that the meeting-house should "be for the use of the Methodist Episcopal church and society, so long as they shall furnish preachers acceptable to a majority of the proprietors," and wherein he agreed to be responsible for three of the twenty-five shares, "and a meeting-house lot." In June following, he, "in consideration of having a meeting-house erected and continued" on a certain lot, "by the proprietors of the South Chapel in Fryeburg," conveyed it to them, with the stipulation that the "lot being given for a meeting-house lot, is to revert to me, unless it should be improved for that purpose," *habendum* "to the said proprietors and their successors forever, provided it be improved for the above purpose." The same year, the proprietors erected and suitably furnished a meeting-house on the lot, in which there was regular preaching by Methodists from the time of its completion until 1859, when the preaching ceased, the house was suffered to get out of repair, and the stoves and furniture were removed for safety to neighboring dwellings. In 1864, the plaintiffs' father died, intestate. In 1866, the defendants, under the direction of persons acting as the superintending committee of the proprietors, entered, reshingled, and otherwise repaired the house, since which time there has been regular preaching therein by the Methodists. In trespass for entering to repair the house, *Held,* (1) That the plaintiffs are estopped by their father's deed to deny the existence of the "Proprietors of the South Chapel in Fryeburg;" (2) That the defendants can assert the estoppel.

ON REPORT.

TRESPASS *quare clausum*, for breaking and entering a parcel of land conveyed by the father of the plaintiffs, by his deed of June 19, 1845, to the "Proprietors of the South Chapel in Fryeburg.".

Numerous witnesses, among whom was one of the ministers who had frequently preached in the meeting-house, testified that the house began to get out of repair before the preaching was discontinued; that between 1859 and 1865, the house had become much dilapidated, so that some portions of the roof had become so rotten, that the snows and rains had leaked through, and in consequence thereof the plastering had fallen off in many spots, and soiled the pews; that a dozen panes of the glass were broken; that some of the blinds were torn off; that the carpet, lamps, stoves, chairs, and sofa were carried into neighboring dwellings for safety; that when the house was repaired in 1866, the whole ceiling overhead was replastered, and the house reshingled, by subscription.

The defendants, in committing the acts complained of in the writ, acted under the direction of Eliphalet Weeks, Isaac Abbott, and Philip Eastman, who claimed to be the superintending committee of the South Chapel in Fryeburg.

Numerous extracts from the records of the proprietors were put into the case; but the view of the court renders a report of them unnecessary.

The remaining facts are sufficiently stated in the opinion.

*Howard & Cleaves*, for the plaintiffs.

I. There never was any such corporation or body politic as the "Proprietors of the South Chapel in Fryeburg."

II. But if otherwise, the property reverted to the grantor before his death.

The grantees were to erect, continue, and improve it forever.

The proprietary wholly abandoned the meeting-house from March 17, 1852 (when they held their last meeting as a corporation), until December, 1865, when some of them undertook to get up a meeting. The house became dilapidated,—patched up; afterwards shingled by subscription,—not by the "proprietors."

Methodists preached there, but not in connection with the proprietary. Abandoned for preaching in 1859.

The proprietary not caring for it, the grantor took possession and claimed the forfeiture.

The defendants acted in their own wrong, not acting under the authority of persons having any authority.

III. Estoppels affect and bind parties and privies only. The defendants are neither. The deed is made to a corporation only, and not to any individuals who might compose it. There being no corporation, there could be no one to set up the doctrine of estoppel against the grantor or his heirs.

The defendants were neither parties nor privies, nor were those under whom the defendants assumed to act.

If the deed had been made to a bank chartered but not organized, could the incorporators or their servants plead the deed in estoppel under analogous circumstances?

*D. Hammons,* for the defendants.

BARROWS, J. Trespass *quare clausum.* The plaintiffs are the surviving children and heirs at law of Edward L. Osgood, who in 1845 was the owner of the *locus in quo.* He united with an association, who undertook to organize as a corporation, under the name and style of " The Proprietors of the South Chapel in Fryeburg," for the purpose of procuring a site, and erecting thereon a meeting-house, and owning, managing, and disposing of the pews therein. He agreed under his own hand, in a subscription paper containing numerous other subscriptions, to be responsible for " three shares and a meeting-house lot." This paper provides for the formation of a corporation, as above stated,—for the payment of assessments not to exceed sixty dollars a share,—each proprietor to be entitled to two votes for every share he owns; said chapel to be for the use of the Methodist Episcopal church and society so long as they shall furnish preachers who shall be acceptable to a majority of the proprietors; but when they fail so to do, the chapel to be considered proprietors' property, according to the law, and the proprietors who

are not Methodists shall purchase the pews of the Methodists at an agreed or an appraised value, or set them off their full share of their time in said chapel according to their property therein, whether they own a tenth part therein or not." To this association of which he was himself a member, the father of the plaintiffs conveyed the *locus* by deed duly executed June 19, 1845, in which the grantees are described as "The Proprietors of the South Chapel in Fryeburg."

In this conveyance the grantor declares that it is made "in consideration of having a meeting-house erected and continued on the lot of land hereafter described;" and he further stipulates as follows: "This lot being given for a meeting-house lot, is to revert to me, unless it should be improved for that purpose." Then comes the *habendum*, "to the said proprietors and their successors forever, provided it be improved for the above purpose." The same year a meeting-house was erected, well built of the best materials, fifty pews subscribed for, and sold for enough to complete the furnishing of the house in a comfortable and commodious manner as a place of worship, and the whole paid for when finished; and from that time forward there was regular preaching in the house, under the auspices of the Methodist denomination, until the spring of 1859. After that the Methodists ceased to furnish preachers; the house was suffered to get out of repair; the stoves and furniture were removed for safe-keeping to neighboring dwelling-houses, and up to the time of the death of Colonel Osgood, the grantor, in April, 1864, it does not appear to have been occupied for religious services, except upon the occasion of a funeral. Colonel Osgood does not appear ever to have taken any formal possession of the house, claiming a forfeiture; but there is testimony from which it may fairly be inferred that he took one of the keys from the door while a member of the executive committee of the proprietors was in the house, for the purpose of cleaning it up, and that the committeeman did not consent to the taking, nor know by whom it was taken.

t would seem that thereafterwards Colonel Osgood gave permission for the holding of political meetings and other gatherings in the

house, and that some of the proprietors knew that he asserted that the lot had been forfeited, by the failure to occupy the house for religious services. But the other key remained in the possession of the sexton, employed by the proprietors, until it was borrowed by Colonel Osgood's administrator in 1866, and McNeil, a witness for the plaintiffs, testifies among other things, that he was one of the proprietors, and a member of the executive committee, and in that capacity was frequently in the house, between 1859 and 1865, for the purpose of cleaning it up; that the key was frequently in different men's hands; that whenever one of the proprietors wanted it, he gave it to him; that some slight repairs amounting to $10 were made in 1864; that he had charge of the house, as one of the committee, up to 1865; that he never paid any attention to Colonel Osgood's claim of the house, but that he abandoned it after H. H. Smith, Esq., the administrator on Colonel Osgood's estate, took a formal possession of it in 1865, in the presence of witnesses claiming a forfeiture. It is in proof that in August, 1864, Mr. James R. Osgood, one of the plaintiffs, and Mr. Smith, the administrator, went into the house, and that Mr. Osgood then and there said that he took possession of it in behalf of himself and the other heirs; but there was no one present except Smith, and no reason was assigned for the claim. In April, 1865, Colonel Osgood's administrator, having been licensed to make sale of the real estate belonging to his intestate, made a formal entry in the presence of witnesses, for the declared purpose of reinvesting the title in the estate of the grantor, claiming that it had reverted by reason of having ceased to be improved by the proprietors as a meeting-house lot. In the spring of 1866, these defendants, under the direction of certain individuals, who were acting as the superintending committee of the proprietors, entered the house against the protestations of Mr. Smith, new shingled and repaired it generally, and since that time Methodist preachers have held regular services on Sunday in it as before. It is this entry for the purpose of repairing, in behalf of the proprietors, which is the trespass complained of.

Much of the elaborate and ingenious argument of the plaintiffs'

counsel is devoted to establishing the propositions that the records of the proprietors fail to show a legal organization as a corporation, that nothing passed by Colonel Osgood's deed, there being no such legally organized body as " The Proprietors of the South Chapel in Fryeburg," capable of taking as grantees; that there was no legal election of the committee, under whose direction the defendants acted, and hence the defendants cannot justify under the proprietor's title, and that (however these things may be) the estate of the proprietors was forfeited by the failure to have preaching maintained in the house from 1859 to 1866, and to keep it in repair during that time, and that it reverted to Colonel Osgood, according to the provisions of the deed.

But in view of the facts above recited, we hold:

1. That Colonel Osgood and his heirs must be considered as estopped by his deed to deny the existence of his grantee. Having made this conveyance, and his associates in the undertaking having contributed their money and materials and labor for the erection of the meeting-house, and then sold and conveyed the pews therein to purchasers for value, who thereby became associated with them in the proprietorship, neither he nor his heirs can be heard to assert in a suit against these associates, or their servants, that there is no such corporation, as he, by his solemn act of conveyance, once affirmed there was; on the strength of which affirmation those parties invested their money, and received the deeds of their pews. Nor can it be maintained that these defendants, acting as it is admitted they did under the direction of those who were at all events *de facto* the superintending committee of the proprietors (and a majority of them among the original associates and proprietors), are such mere strangers and wrong-doers as to deprive them of the right to assert this estoppel.

2. Colonel Osgood's deed conveyed an estate upon condition subsequent.

It cannot be reasonably supposed that he expected his associates to place a meeting-house upon a lot, the title to which remained in him, or that they intended to accept a conveyance which vested no

interest in the proprietary. "If from the nature of the act to be performed, and the time required for its performance, it is evidently the intention of the parties that the estate shall vest, and the grantee perform the act after taking possession, then the condition is subsequent." *Underhill* v. *Saratoga Railroad*, 20 Barb. N. Y. 455.

3. The estate having thus vested in Colonel Osgood's grantee, although liable to be forfeited by non-performance of the condition subsequent, would, notwithstanding a breach of the condition, still continue in the grantee, with all of its original qualities and incidents, until defeated by an actual entry made for the purpose of defeating it, by some one having the right to claim for such forfeiture. Here is no conditional limitation of the estate granted.

The language of the conveyance is not such as to carry an estate only *durante, dum, donec, quousque, tamdiu*, which would terminate by the breach of the condition, *ipso facto*. It is purely an estate in freehold, defeasible by a breach of the condition, if the parties entitled to require the performance of the condition choose to assert their rights.

In order to avoid the estate of the grantee, or subject his servants to an action of trespass for acts done upon it, or cause it to revest in the grantor, or those who have succeeded to his rights, an entry is essential, and not dispensed with by any of our statute provisions. *Marwick* v. *Andrews*, 25 Maine, 525; *Tallman* v. *Snow*, 35 Maine, 342.

4. Such entry may be made after breach of the condition by the grantor or his heirs. We do not think that the positions taken by the counsel for the defendants that the heirs of Colonel Osgood can have no right to reënter for a breach of the condition, because the language of the deed is, " to revert to me, unless," etc., without mention made of the heirs,—and that the fee became absolute in the grantees by the mere erection of the meeting-house,—can be maintained.

Where the estate is granted upon an express condition, as this manifestly was (for the *habendum* also contains the language of

proviso), it is unnecessary to stipulate also for a right of entry for a breach of the condition. That follows without an express reservation to that effect. *Thomas* v. *Record*, 47 Maine, 500; *Gray* v. *Blanchard*, 8 Pick. 291, 292. And the heir, though he be not expressly mentioned in the deed, may take advantage of the breach by entry. 2 Greenl. Cruise, 42, tit. xiii, c. 2; 1 Washburn on Real Property, 452, ed. of 1860.

" For an heir shall take advantage of a condition, though no estate descend to him from the ancestor." Shephard's Touchstone, fol. ed. 489. *Jackson* v. *Topping*, 1 Wend. 388.

This property was donated by Colonel Osgood for a meeting-house lot, and " in consideration of having a meeting-house erected and continued upon it," and " is to be held by the proprietors and their successors forever, provided it be improved for the above purpose."

If the proprietors pervert the gift to other uses, or fail to improve it for the purpose for which it was given, by abandoning it for such a length of time as shall be plainly inconsistent with the fair performance of their duty in the premises, it cannot be doubted that Colonel Osgood's heirs would have the right to claim a forfeiture, and the right to enter for a breach occurring after the death of their ancestor. It is not merely the erection, but the continuance of a meeting-house upon the lot, which will constitute a performance of the condition.

5. Had there been such an entry, by any party entitled to make it, as would defeat the estate of the grantees, prior to the doing of the acts by the defendants, which are the subject of this suit? The evidence is altogether insufficient to show such an entry by Colonel Osgood. His acts and declarations about the matter seem equivocal, and rather minatory than indicative of a positive intention to assert a forfeiture and reclaim the estate. He was a counsellor at law, and doubtless aware of the necessity of a distinct and decisive act on his part to revest the estate in himself. If he had fully made up his mind to assert his claim, it is reasonable to suppose that when he took one of the keys from the door while the plaintiffs' witness,

McNeil, was in the house, he would have made known the act, and the design of it, to him. His other acts are precisely those which one having a large interest in proprietary property is likely enough, in the loose way in which such property is commonly managed, to assume to do, without feeling that he thereby infringed on the rights of the other owners. They fall short of establishing an entry for breach of the condition, and so they seem to have been regarded by his heirs and administrator. Whether the entries made by them respectively could be deemed sufficient, we need not now stop to consider; because,

6. We think upon the whole that the evidence fails to show a breach of the condition.

The grant is to be construed most strongly against the grantor, and to prevent a forfeiture. *Hooper* v. *Cummings*, 45 Maine, 359; *Merrifield* v. *Cobleigh*, 4 Cush. 178.

The condition is not to be enlarged by construction, so as to cover what is not necessarily implied by the terms used. It imposes upon the grantees the duty of erecting, and continuing upon the lot, a house for public worship. But these proprietors were not a parish, nor a religious society. It would not seem that there was any unanimity of religious sentiment among them. The original subscription paper and agreement devotes the house to the use of the Methodist denomination, so long as they furnish preachers who are acceptable to a majority of the proprietors; but when they fail to do so it would not seem, from the character of the arrangements made, that anybody stood charged with the duty of supplying preachers, and all must have contemplated the probability that the house, which the proprietors were bound to maintain, would often be, for longer or shorter periods, unoccupied. At all events, construed strictly as the law requires us to construe it, the condition in the deed does not require the proprietors, upon pain of forfeiture, to maintain preaching in the meeting-house, which they were to erect and continue upon the lot. There is some evidence of neglect, which doubtless hazarded the rights of the proprietors, and gave color to the claim of forfeiture which the plaintiffs assert. But ab-

solute dereliction is not proven. Slight repairs were made from time to time, and the sexton and committee-man, McNeil, seem to have in some sort attended to their duties.

Some repairs were made upon the belfry in 1861, or 1862, and the shingling was patched up in 1863, and, notwithstanding some degree of remissness, a repetition of which would lend additional force to any future claim of forfeiture, we are disposed to hold that the case does not show an absolute breach of the condition.

*Plaintiffs nonsuit.*

APPLETON, C. J.; CUTTING, KENT, WALTON, and DANFORTH, JJ., concurred.