WILLIAM A. ADAMS, Appellant, *v*. JEMIMA LINDELL, Respondent.

### January 29, 1878.

1. The rule as to the validation of the acts of *de facto* officers is one of policy, and may be applied, not only where there is no *de jure* officer, but where the legal office itself no longer exists. Where the person claiming to hold the office is not a mere usurper, but, owing to a mistake of fact, held under a perfect color of right, which justified men in concluding that he was a legal officer holding a legal office, and where the fact that the office was abolished remained, for a time, unknown, owing to a false announcement of election-returns, his acts as such officer, done after the abolition of the

office and before the fact was known, may be validated for the purpose of supporting contracts made with him where money and labor have been expended on the faith of his authority to act and contract as such officer.

2. A special tax-bill issued under an ordinance approved by the acting mayor and City Council of St. Louis, on Dec. 29, 1876, after the City Council was abolished and the new Charter adopted, but before the fact was known, is not necessarily void.

3. Land was conveyed to a municipal corporation, to be used as a market-place, to be held in fee so long as so used, to revert to the donor when it ceased to be so used, and the donee, upon failure to so use it, to reconvey to the donor. *Held*, that this was not a determinable fee, but an estate held upon a condition subsequent; and that the condition, though broken, did not defeat the estate before entry by the donor.

4. The provisions in the Constitution of 1875, relating to the uniformity and equality of taxation, and the taking of private property for public use, were not intended to apply to, and do not affect any change in, the law as to the right of municipal corporations to make special assessments for local improvements.

APPEAL from St. Louis Circuit Court.

*Reversed and remanded.*

J. H. WIETING, with J. C. TERRY, for appellant: The rule validating the acts of *de facto* officers may be applied where the legal office has ceased to exist, where the would-be officer, under a mistake of fact, holds under color of right, such as would naturally lead men to suppose he was a legal officer. — *The State ex rel.* v. *Sutton*, 3 Mo. App. 388; *The State* v. *Carroll*, 38 Conn. 467; *Rex* v. *Bedford*, 6 East; *The State ex rel.* v. *Finn*, 4 Mo. App. 347. The breach of the condition in the deed from the Lindells to the city did not defeat the estate before entry.—*Messersmith* v. *Messersmith*, 22 Mo. 369; *Warner* v. *Bennet*, 31 Conn. 468; *Attorney-General* v. *Manufacturing Co.*, 14 Gray, 612; *Osgood* v. *Abbot*, 58 Me. 73. Estoppel. — *Grimm* v. *Shickle*, 4 Mo. App. 585; *Seibert* v. *Allen*, 61 Mo. 482; *Keaner* v. *American, etc., Co.*, 9 Bush, 202. The right of municipal corporations to make assessments upon property for local improvements is not affected by the general constitutional provisions relating to taxation, and the taking of private property for public use. — *Palmyra* v. *Morton*, 25 Mo.

593 ; *Egyptian Lever Co.* v. *Hardin,* 27 Mo. 495 ; *Neenan* v. *Smith,* 50 Mo. 525 ; *The State ex rel.* v. *St. Louis,* 62 Mo. 244; *City to use* v. *Clemens,* 49 Mo. 552 ; *Fowler* v. *St. Joseph,* 49 Mo. 552.

GARLAND POLLARD, for respondent : The assessment in this case is void because in conflict with the provisions of the Constitution of 1875. — *Chicago* v. *Larned,* 34 Ill. 203 ; *Howard* v. *St. Clair Drainage Co.,* 51 Ill. 130 ; *Primm* v. *Belleville,* 59 Ill. 144 ; *City of Ottawa* v. *Spencer,* 40 Ill. 211 ; *City of Chicago* v. *Baer,* 41 Ill. 306 ; *Bedard* v. *Hall,* 44 Ill. 91. When the Constitution prohibits the doing of a thing, it abrogates all existing laws authorizing it to be done, and no legislative action is required to enforce the provision. — *Hills* v. *Chicago,* 60 Ill. 86 ; *Otis* v. *Chicago,* 62 Ill. 299. Where there is no office *de jure,* there can be no officer *de facto;* consequently there can be no validation of his acts as a *de facto* officer. — *Luther* v. *Borden,* 7 How. 1, 38 ; *Welch* v. *Ste. Genevieve,* 1 Dill. 130 ; *The People* v. *White,* 24 Wend. 520 ; *Hildreth* v. *McIntire,* 1 J. J. Marsh. 206 ; *Henderson* v. *Boone County,* 50 Mo. 317. The deed from the Lindells conveyed to the city a determinable or qualified fee, which was determined by the removal of the market-house. — 2 Bla. Com. 109, 155 ; *Leonard* v. *Burr,* 18 N. Y. 96 ; *Miller* v. *Levi,* 44 N. Y. 489. The fact that the parties provided for a reconveyance by the city does not affect the case. The object of that was to afford written evidence of their title. — *Stoddard* v. *Chambers,* 2 How. 284 ; *Pickle* v. *McKissick,* 21 Pa. St. 232 ; *Hayden* v. *Stoughton,* 5 Pick. 528.

HAYDEN, J., delivered the opinion of the court.

This is an action on a special tax-bill, issued by the city engineer of the city of St. Louis, for work done on Third Street, between Christy Avenue and Morgan Street. The case was submitted to the court below on an agreed statement of facts, the substance of which is as follows : Third

Street, between Christy Avenue and Morgan Street, was originally thirty-eight feet and six inches in width. In 1832, Jesse G. and Peter Lindell conveyed, by deed, to the city of St. Louis, a strip of ground thirty feet and six inches wide, on the east side of Third Street, extending from Christy Avenue to Morgan Street, for the purposes therein expressed, which deed contained the clauses given below. This deed was accepted and recorded, and the property taken possession of by the city, and used, for the purposes of the grant, up to the year 1868. A corresponding strip of ground on the other side of Third Street was conveyed by the owners to the city, and thus the street was made about one hundred feet wide. Soon after, the city erected a market-house in the centre of Third Street, which was the purpose for which it was widened. From about 1833 to the summer or fall of 1868, the market-house was used as such, according to the provisions of the deed. In 1868, in pursuance of an ordinance of the city, numbered 5643, approved July 28, 1865, the market-house was sold and removed, and the ground where it had stood repaved by the city, since which there has been no market near the place, but the ground has been in use as a public street.

On July 15, 1876, the City Council of St. Louis passed an ordinance, numbered 10,144, for the reconstruction of Third Street between the streets named, and under this a written contract was entered into between the city and the plaintiff's assignors, dated Aug. 23, 1876, who accordingly commenced the work of reconstruction. The Scheme and Charter were ratified by the qualified voters of the city and county of St. Louis, Aug. 22, 1876, and the certified copies, as required by the Constitution, were deposited Dec. 29, 1876. Afterwards, on Dec. 5, 1876, there was approved by the former mayor and City Council, still acting as such, what purported to be an ordinance of the city of St. Louis, numbered 10,155, passed to amend ordinance 10,144, and to extend the width of Third Street between the curb lines,

so as to make the portion to be paved with granite fifteen feet and nine inches wider on each side than the provisions of ordinance No. 10,144 required. The tax-bill was made out on the basis of the extended limits, as the work was done according to the amendatory ordinance. This work, the granite pavement, as laid, covers a portion of the strip of ground conveyed by the deed from the Lindells to the city. The defendant, who is the owner of the lot described in the petition, made no objection to the use of the strip of ground conveyed by the Lindells to the city as a street, until Nov. 2, 1876, when she first knew that the improvement was being made. She then demanded possession of the land, and notified the contractors that she should refuse to pay for the improvements. Copies of the ordinances and deed were annexed as exhibits. The court below gave judgment for the defendant.

The first question is, whether the tax-bill here sued upon is void by reason of a want of authority in the City Council of St. Louis to pass the ordinance 10,155. In *The State ex rel.* v. *Finn*, it was held by this court that the people of the former county of St. Louis having, through a majority of legal voters voting at the election of Aug. 22, 1876, ratified the Scheme, it became, in theory of law, sixty days after that date, the organic law of the city and county. It is now contended by the respondent, that, as the Charter went into effect at the same time, the City Council was abolished, and that its so-called ordinance is void; that by the new Charter of the city the legislative power was vested in the "Municipal Assembly of the City of St. Louis;" and that after Oct. 22, 1876, there was no such body in existence as the "City Council." The respondent contends that the acts of this body after that date cannot be validated as the acts of *de facto* officers, because, though all the officers of the then existing city government continued to exercise their franchises as if the old order of things continued and the old City Charter was in force, and were universally recog-

nized as lawful officers, yet, as the office in this case was abolished, and the legislative powers vested in a new and distinct body, there being no offices *de jure* there could be no officers *de facto*.

But it will be evident, if we carefully consider the matter, that no sound legal distinction can be founded on the difference thus suggested. Where the office legally exists, and the officer is merely a *de facto* officer, there is a violation of law. The officer not being legally such, his acts are, apart from the principle of validation, of no legal effect; but if to this state of things we superadd the element of non-existence of the office, what essential difference can this make? The question is as to the validity of the acts of a certain man, claiming to be a public officer. If those acts are invalid, they certainly cannot be made more invalid by the addition of another quantity. " Contrary to law " and "invalid" do not admit of degrees of comparison; and in the expression, " clearly invalid," the adverb refers to evidence, not existence. The act of the so-called officer being thus contrary to law, as he has no right to the office, the *de facto* principle is applied, and thus an otherwise void act is validated, not because of any character or quality attached to the so-called officer or to his office, but because this is necessary to preserve the rights of third persons and keep up the organization of society. The rule is based merely on policy, and its origin and historical development show that it is founded in comparative necessity. If the citizen is in no way in fault, if in his dealings he trusts to the non-legal authorities in whom all believe, his rights are not to be destroyed. Where he is in fault, the case is different. But when he himself meets all legal requirements, it is evident that the necessity which creates the rule of validation may exist in precisely the same way and degree where there is no legal office as where there is merely no legal officer; and it is further evident that to apply the principle to cases where there is no legal office is taking no new or further step; for,

as above said, the act being already invalid, it cannot be any more than invalid where there is no legal office. Why, then, should the rule suddenly halt, when both logic and necessity require it to proceed?

To test the reasoning by example, let a case be supposed where a scheme involving the abolition of all existing judicial offices and the creation of new ones is submitted by a constitutional convention to the vote of the people; where this scheme should be carried at the election; but where, through fraud or mistake of the authorities, the result should be announced and universally accepted as a defeat of the scheme. Upon a discovery and proper establishment of the fact that the scheme had been carried, would all the acts of the judicial officers be invalid? Suppose, further, that, between the time of the scheme election and the discovery of the actual result, an election for judicial officers should take place upon the basis that the old order of things was in force; that the judges should qualify under the old laws, and the courts do business accordingly; would the acts of such courts, the sentences of death, as well as the judgments as to civil rights, be beyond the principle of validation? Obviously not; the law is not so helpless in the face of practical difficulties. There would, in the case put, have been no organization under the scheme which in theory of law was in force, and the mere fact that there were no such *de jure* offices as those held by the judges would be an immaterial circumstance.

That these difficulties are practical, and that a correct application of well-settled legal principles is demanded, is shown by the facts in the " Scheme and Charter " case. *The State ex rel.* v. *Sutton et al.*, 3 Mo. App. 388. In that case, this court held that, though the offices of judges of the County Court of St. Louis County, and that court, had been abolished by the event of the scheme and charter election, and even though when Mr. Justice Speck acted as judge of that court, and certified to the result of the election, there

was (independently of the Scheme) no such office in existence as that which he pretended to fill, yet as there was color of right for his action as an officer in such office, and as, though his office had been abolished, the new order of things had not gone into existence or become organized, his acts, so far as they affected the rights of third persons and the public, were valid as the acts of a *de facto* officer. The circumstances of that case were peculiar, but the application of the legal principle is plain. The filing of the certificate was required by the Constitution, and the certificate was to be signed by the presiding judge of the County Court, etc. This certificate, however, was merely evidence; the actual fact as to the legal result of the election was put in issue by a direct proceeding in that case, and, accordingly, was not ascertained till the final decision. When so ascertained, it followed that the Scheme and Charter were, in legal theory, in operation sixty days after the date of the election. As the fact, however, was first unknown, and afterwards in legal contest by *quo warranto*, and as Mr. Speck held an office which, except on the establishment of the fact, was a legal office, to which he was duly elected, his action involved no mistake of law; but, on the contrary, there was perfect color of right, which justified men in concluding that he was a legal officer holding a legal office.

It is upon the existence of this element of color of right, not upon any difference between *de facto* and *de jure* office, that the legal distinction rests. It is impossible to administer the law except by presuming that every man knows the law, but there is no presumption that men know every matter of fact. If the citizen mistakes the law, and votes for an officer where the law provides not for any such officer or corresponding office, but for a different officer and office, this is the fault of the citizen. Whether, indeed, any possible complication of circumstances can occur so as to make a mistake of law a foundation for the *de facto* rule, it is not necessary to discuss; it is sufficient to say that the diffi-

culties that now present themselves can all be solved by adverting to what is required by the rule under consideration. In order that the principle of validation may apply, there must be color of right in the acts of the would-be officer. If he is a mere intruder or usurper, the law does not validate his acts, for the " apparent circumstances of color or reputation leading men to suppose he is a legal officer " do not exist. How, then, can such circumstances exist where men claim to be officers under a law which is invalid, or does not apply to their case, and which, if men know the law, they may see to be void or without application? Applying the principle, if, as in case of *Hildreth's Heirs* v. *McIntire's Devisees*, 1 J. J. Marsh. 206, the Legislature attempts to override the Constitution, and, in place of a court provided for by it, to create another court, and certain persons, under such act, assume to displace the judges of the constitutional court which is acting, it may well be held that the public are bound to know that the pretended judges have no legal authority. Neither this nor any other case cited by the respondent is authority for the position that there can be no *de facto* officer without a *de jure* office.

In *The People* v. *White*, 24 Wend. 520, 540, the opinion of Chancellor Walworth is merely to the effect that the rule of validation cannot properly be applied to an unconstitutional exercise of power by an officer *de jure*, who claims to exercise that power by virtue of such office. This opinion was expressed upon a question whether the Constitution had abrogated the right of aldermen to act as judicial officers ; and, as the chancellor viewed it, the matter resolved itself into a question of law. This is made still clearer by the opinion of Senator Verplanck (p. 563 *et seq.*), who, so far as he holds that the *de facto* rule has no application, bases his position expressly upon the ground that the question of the power of the officers was one of law, and that the prisoner could and should have contested this power by a plea to the jurisdiction, or otherwise.

In *Carleton* v. *The People*, 10 Mich. 258, the court held that the acts in question were the acts of a *de facto* officer. The dissenting opinions of Campbell and Christiancy, JJ., are to the effect that there was no color of right, because the law creating the office had not, at the time in question, gone into effect. Judge Campbell remarks that where the law itself negatives the idea that there can be a legal incumbent, third persons, being bound to know the law, are bound to know the acts are not of legal effect.

In *Luther* v. *Borden*, 7 How. 1, the question was between the established government and the so-called government in rebellion against it, — the Dorr government. Not only was the "Dorr government" not legally established, but it was never able to exercise authority or to secure obedience. It was, obviously to all, in legal view, a rebellion, and it was a rebellion that did not succeed. The Supreme Court of the United States held that it was for the political department of the government to determine which of the two contending powers was the lawful authority, and for the courts to follow such decision.

In *The State* v. *County Court of Boone County*, 50 Mo. 317, the question was as to the constitutionality of a law establishing a certain court, and the Supreme Court held that the law was constitutional. If it had held otherwise, the question would then have arisen whether, when a law which creates a court is itself contrary to the organic law, there can be color of right so as to validate the acts as to third persons. Upon this question different views have been taken, some judges holding that in such case the law is presumed to be constitutional until a decision to the contrary; others holding that when a law is declared to be unconstitutional, it is presumed to have always been known to be such. Which, as a rule of policy, is the sounder and wiser rule it is not necessary to determine here.

The case of *Decorah* v. *Bullis*, 25 Iowa, 12, claimed to be directly in point, is removed by two distinct removes from the question involved by the case at bar. In fact, no

question there arose as to the *de facto* rule. The proceeding was directly by the town, to recover a sum of money *for itself*. No one had, as in the case at bar, made a contract with existing authorities and expended labor on the faith of their being such. It is in favor of the rights of third persons that the *de facto* rule exists, and such rights were not there involved. Again, the question was whether the act of 1858 applied to the town of Decorah; and the court held, as a matter of law, that it did not, as that town was incorporated under a special charter. So, in *Welch v. Ste. Genevieve*, 1 Dill. 136, the question was one of law, and the court decided that a general act had no application to a corporation existing under a special charter. In both these cases there was no color of right justifying men in supposing that the authority was legal; and that this is the true distinction, the court in the case last cited recognizes when (p. 137) it says: "The new organization is a bold *usurpation* of the franchises of the State," etc.

Thus, if the action of the third parties whose rights are involved is based on a mistake in law, one case is presented. Where, however, there is no fault on the part of such persons, but the mistake is that the authorities have erred or been misinformed as to a fact, — as where they have, for instance, wrongly announced the result of an election, — another case is presented, and there is perfect color of title. The discovery that the new scheme has been carried, not defeated, does not break up society and plunge every thing into chaos. On the contrary, it is here that the healing action of the law comes in and repairs the dislocations in the body-politic. As the old offices were originally legal offices, as they were valid in their birth, the law has a proper starting-point. The only question is as to their prolongation; and whether this is greater or less is a mere question of time, which cannot affect the efficacy of the acts. Other things being equal, an earlier act is not validated and a later one void. *The State ex rel. v. Sutton, (supra)*.

The learned judge who delivered the opinion in *Decorah* v. *Bullis*, (*supra*), appears in that case, and in his valuable work upon Corporations (1 Dill. on Mun. Corp., sec. 214), not to have adverted to this distinction, and, having in view only one class of cases, has laid down his propositions without some necessary qualifications.

Applying what has been said to the facts of the case at bar, it will be found that the rule of validation applies to the ordinance (No. 10,155) here in question. Before the new Charter went into effect, the City Council was a body existing by law, and was regularly organized; and all the old officers of the old city government, including the Council, continued to exercise the functions of their offices, and to be treated by all as legal officers, until after this ordinance was approved, it being the understanding that the Scheme and Charter had been defeated. By the provisions of the old Charter, the City Council met in regular session in November, 1876, and, among others, passed the ordinance now it question, which was approved by the mayor, there being no other legislative body of the city in existence, as no members of the new Assembly provided for by the new Charter were voted for until April, 1877. It was under this ordinance, as amendatory of ordinance No. 10,144, that the rights of the plaintiff's assignors accrued, by virtue of the contract above referred to. The city engineer issued a tax-bill to the contractors, dated Dec. 29, 1876, which is a method provided by law for enforcing, not the claim of the city itself, but of third parties who had contracted with it.

The ordinance being valid as to the plaintiff and his assignors, the next question is whether the tax-bill is void as having been issued for work done on private property. This depends on the terms of the deed from the Lindells to the city, the material part of which is as follows. After conveying the property to the city and its successors forever, the deed reads: " And it is, moreover, understood and agreed by and between said parties to these presents, that

the foregoing release is made *on the condition* and for the purpose of so widening Third Street as to give sufficient space for the new market-house in the north ward of said city, in pursuance of 'An ordinance widening part of Third Street, and authorizing the erection of a market-house in the north ward,' approved the 28th day of January, 1831, the said granted and released premises to be occupied and enjoyed by the said party of the second part, and their successors, as a *street* and *market-place* as aforesaid, *so long as* the said market-house and the purposes for which it is erected shall continue ; and as soon as the said granted and released premises cease to be used and occupied for the purposes aforesaid, the said lot or parcel of ground released as aforesaid shall *revert* to the said party of the first part, their heirs or assigns ; and the said party of the second part shall, upon a failure to use said market-house for the purposes aforesaid, *reconvey* to the said party of the first part all the right, title, and interest which, by this conveyance, is or shall be vested in the said party of the second part and their successors.'' It is contended by the respondent that this deed conveyed to the city a determinable or qualified fee, which was liable to be, and was, determined by the removal of the market-house. But as there is first an absolute conveyance, and then a condition is expressed and called such, the estate must be regarded as one held on condition subsequent, especially when the nature of the condition is considered, and not upon limitation. It is true that the words " so long as " and " revert " are used ; but, on the other hand, it is provided that on failure, etc., the city shall " reconvey.'' The general rule was that a condition did not defeat the estate, although broken, until entry by the grantor or his heirs ; that the entry was necessary to defeat the livery made on the creation of the original estate. In recent times, the stronger consideration has been, where the words of the grant are ambiguous, that conditions subsequent are not favored in law, as they tend to destroy estates. If

the grantors in the present deed intended that the estate should determine on the mere happening of the event, they should have used clearer words to express that intention. *Mary Partington's Case*, 5 Co., Part 10, 41, *a; Attorney-General* v. *Merrimack Co.*, 14 Gray, 586, 612 ; *Warner* v. *Bennett*, 31 Conn. 468 ; *Osgood* v. *Abbott*, 58 Me. 73 ; *Messersmith* v. *Messersmith*, 22 Mo. 372 ; 4 Kent's Comm. *124, *126, *128 ; 2 Washb. on Real. Prop. *450.

It is next claimed that this assessment was void because it was in conflict with the provisions of the Constitution of 1875. In the case of *Creamer* v. *Allen*, 3 Mo. App. 545, it was held that it was too late to raise the question as to the constitutionality of assessments for local improvements, on the ground that an assessment in proportion as the area of the lot was to the area of the district was contrary to sec. 30 of art. 1 of the Constitution of 1865. The authorities were there cited, and it was said that the rules so often declared had operated, to a certain extent, as rules of property, and that most mischievous consequences would follow a disturbance of them. The point is now made, that in the Constitution of 1875 there are new provisions, containing additional limitations upon the powers of taxation and of taking property by right of eminent domain. The following provisions in regard to the taxing power are relied upon :

" Article X., section 1. The taxing power may be exercised by the General Assembly for State purposes, and by counties and other municipal corporations, under an authority granted to them by the General Assembly, for county and other corporate purposes.    *    *    *

" Sec. 3. Taxes may be levied and collected for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general laws.

" Sec. 4. All property subject to taxation shall be taxed in proportion to its value.    *    *    *

" Sec. 10. The General Assembly shall not impose taxes upon counties, cities, towns, or other municipal corporations; but may, by general laws, vest in the corporate authority thereof the power to assess and collect taxes for such purposes.

" Sec. 11. Taxes for county, city, town, and school purposes may be levied on all subjects and objects of taxation, but the valuation of property therefor shall not exceed the valuation of the same property in such town, city, or school district for State and county purposes."

This section then goes on to prescribe annual rates of taxation, which are not to be exceeded, graduated according to the amount of taxable property; thus, in counties having $6,000,000, or less, fifty cents on the $100 valuation for county purposes is fixed as a maximum, etc. It then prescribes how the amount of taxable property which is thus to govern in fixing the rate shall be ascertained, etc., and ends with this clause: " Said restrictions as to rates shall apply to taxes of every kind and description, whether *general or special*, except to pay valid indebtedness now existing, or bonds which may be issued in renewal of such indebtedness." It is to be observed that sec. 4, above quoted, is almost identical in language with, and certainly exactly the same in meaning as, the clause in the Constitution of 1865, which has been repeatedly held to be not violated by such assessments as the present; and the question accordingly arises, whether any of the other sections now cited, or any clause in them, goes beyond sec. 4 in its intent or effect as a restrictive clause. It is contended that if this is a tax for a corporate purpose it is unconstitutionally levied, because it is not uniform upon the same class of subjects within the territorial limits of the authority levying the tax. This is, in effect, the same objection which has before been urged, the application differing as the words of the Constitution differ. Uniformity and equality of taxation are aimed at by the clause now relied on in sec. 3, as they were by the

clause in the Constitution of 1865 ; the question is, whether the new clauses introduce any new element affecting that peculiar exercise of the taxing power well known, at the time when the Constitution of 1875 was framed, as special assessments for local improvements.

The use of the expressions, " the taxing power," in sec. 1, where the exercise of that general authority is provided for, under which taxes and special assessments alike are levied, and the use, in the subsequent sections, of the words " taxes," " tax," and " taxation ;" and what is more significant, the non-use of the expression " special assessments," or any apt phrase to the same effect, would, in view of the condition of things in this State at the time when the Constitution was framed, almost seem to settle the question now presented. Taxes are imposed for purposes of revenue generally, and the ordinary exercise of the taxing power is taxation. Special assessments are not " taxation " or " taxes " in that sense of the words, but are imposed with reference to local improvements, have in view benefits to the property upon which they are assessed, and form a peculiar exercise of the general taxing power. *Lockwood* v. *City of St. Louis*, 24 Mo. 22 ; *Egyptian Levee Co.* v. *Hardin*, 27 Mo. 495 ; *Palmer* v. *Stumph*, 29 Ind. 329 ; *Hale* v. *Kenosha*, 29 Wis. 599 ; Cooley on Tax. 446. As, after mentioning the taxing power, and providing for its exercise " by * * * municipal corporations * * * for corporate purposes," though there are many provisions in regard to taxes and taxation, nothing is said in regard to special assessments, the inference is that the Convention did not intend to alter the law as it then stood. If it was to be altered, to alter it was peculiarly the province of the Convention. It had been repeatedly contended that, under the Constitution of 1865, the acts providing for these local assessments were invalid ; but the courts, by adjudications, had established their validity. Practically, the frequency of these assessments, and what was considered their oner-

ous nature, had attracted attention to them; while, in law, the learning relating to them had become a branch by itself. Knowing that, under the provisions of the Constitution, the laws would remain the same as before, unless apt words were used to indicate a repeal, the Convention used no apt words. No new element affecting these new assessments can be gathered from any new provision; while neither the term itself, nor any thing which could have been intended as a synonym for the term, has been employed. The words " general or special," near the end of sec. 11, refer, as the section says and the context shows, to " taxes," not to special assessments. The inference from the use of the words " general or special," in connection with the word " taxes," as there used, is, rather, that while the Convention had before it the subject of general and special impositions, it refused to take away the power, then well known to be possessed by municipal corporations of a certain class in this State, of enforcing special assessments for local improvements. In regard to the new clauses on the subject of taking private property without compensation, in the Constitution of 1875, we are of opinion that there is no difference between them and the corresponding clause in the Constitution of 1865, which affects the question of the present assessment.

In view of the uniform decisions of the courts of this State, it is not to the purpose to cite decisions of the Supreme Court of Illinois as to special assessments.

The assessment for the cost of paving, curbing, guttering, etc., upon the adjoining property, in proportion to its frontage, as prescribed by sec. 4 of ordinance No. 10,144, was proper and according to law. Acts 1870, pp. 460, 466; Acts 1875, p. 334, secs. 4, 5; Acts 1870, p. 487, sec. 8; Acts 1867, p. 74, sec. 11; *City to use* v. *Clemens*, 49 Mo. 552.

Upon the facts of this case, there is obviously nothing in the point that the city was estopped from issuing a special

tax-bill for this work in favor of the contractor after it had removed the market-house.

Upon the agreed statement, judgment should have been rendered for the plaintiff below. The judgment is reversed and the cause remanded, to be proceeded with according to this opinion. All the judges concur.