Simpson v. McGonegal.

ISAAC P. SIMPSON, Appellant, v. WILLIAM J. McGONEGAL, Respondent.

Kansas City Court of Appeals, January 30, 1893.

1. **Municipal Corporations:** COUNCIL DE FACTO: ACTS VALID. An ordinance of the Kansas City council authorizing certain street improvement and passed while the four Westport wards were represented in the council is valid, though such Westport wards were not part of the city and its representatives were not *de jure* members of the council, and though such representatives voted for the ordinance, and without their vote it failed of the necessary majority.

2. **Officers:** DE FACTO OFFICE AND OFFICER: RULE. To render valid the acts of an officer *de facto*, it is not always necessary that there should be an office *de jure;* the rule rests rather on the color of the right appearing in the acting officer and not upon any difference between a *de facto* and *de jure* office. (*Following Adams v. Lindell*, 5 Mo. App. 197; s. c., 72 Mo. 198.)

3. **Definitions:** OFFICER DE FACTO. The following definitions occur in the opinion: An officer *de facto* is no other than he who has the reputation of being such, and yet is not a good officer in point of law; an officer *de facto* is one whose acts though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons.

*Appeal from the Jackson Circuit Court.*—HON. J. H. SLOVER, Judge.

AFFIRMED.

*Ed. G. Taylor*, for appellant.

(1) As a matter of law the eleventh, twelfth, thirteenth and fourteenth wards were never in the city, and

they could not, therefore have members in the lower house. *City of Westport v. Kansas City,* 103 Mo. 141; Charter of Kansas City, 1889, art. 2, sec. 1, p. 9. (2) Where there could not be a member *de jure,* there could not be a member *de facto. Ex parte Snyder,* 64 Mo. 58; *Jester v. Spurgeon,* 27 Mo. App. 477; *Norton v. Shelby Co.,* 118 U. S. 425; *Hildreth v. McIntire,* 1 J. J. Marsh. (Ky.) 206; *State v. Francis,* 26 Kan. 724; *Prouty v. Stover,* 11 Kan. 235; 1 Dillon on Municipal Corporations [6 Ed.] secs. 214, 276; *In re Hinkle,* 31 Kan. 712; *McCahan v. Commissioners,* 8 Kan. 437; *Braidy v. Theritt,* 17 Kan. 468; *Decorah v. Bullis,* 25 Iowa, 15; Charter of Kansas City, 1889, art. 2, secs. 2, 4, 5, 6, p. 9; art. 17, sec. 42, p. 135; *Carlton v. People,* 10 Mich. 250; *State v. Dunson,* 71 Tex. 65; *Buford v. State,* 72 Tex. 182; *People v. Oakland,* 28 Pac. Rep. 807. (3) The power of a city to compel property-owners is to be strictly construed, and unless an ordinance in exercise of the power is passed in strict conformity to the provisions of the charter it is void. *Kiley v. Openheimer,* 55 Mo. 374; *Leach v. Cargill,* 60 Mo. 316; *Ruggles v. Collier,* 43 Mo. 353; Cooley on Constitutional Limitations [6 Ed.] 155, 233; *Swift v. Williamsburg,* 24 Barb. (N. Y.) 427; *State v. Bank,* 45 Mo. 528; *City of Kansas v. Swope,* 79 Mo. 446.

*Scarritt & Scarritt,* for respondent.

The city has power to extend its limits. *City of Westport v. Kansas City,* 103 Mo. 144; Session Acts, 1887, p. 42; City Charter, sec. 4, p. 7. The extension, however, was made in this illegal way, and the territory within the new boundaries was taken within the city and recognized as part of the city and treated as part of the city. As a necessary consequence of the accession of such new territory, the four aldermen com-

plained of were elected at the general election in 1890 as aldermen of Kansas City from the four wards constituting such new territory. City Charter, sec 5, p. 7; sec. 8, p. 8; sec. 11, p. 9. We claim that under this state of facts they were *de facto* members of the common council of Kansas City, and we are supported in this claim, not only by the highest authority, but by the almost universally announced doctrine of the courts. *Adams v. Lindell*, 5 Mo. App. 197; s. c., 72 Mo. 198; *State v. Carroll*, 38 Conn. 449; 9 Am. Rep. 409; *Fleming v. Mulhall*, 9 Mo. App. 72; *State ex rel. v. Sutton*, 3 Mo. App. 402; *School District v. State*, 29 Kan. 57; *Brown v. O'Connell*, 36 Conn. 432; 4 Am. Rep. 89.

GILL, J.—The learned trial judge, in a written opinion, thus fully states the nature of this controversy: "This is a proceeding by bill in equity to declare void certain special tax bills issued to the defendant for paving Eleventh street, on the ground that the ordinance authorizing the improvement was not passed by a two-thirds vote of the lower house of the council as required by the charter.

"The final vote on the ordinance in question was taken in the lower house of the council, on September 8, 1890.

"The charter of the city, adopted May 8, 1890, provides that: 'The legislative functions of said city shall be vested in a common council which shall consist of two houses, one to be called the upper and the other the lower house. The lower house shall consist of one member from each ward of the city; provided, however, that the members of the common council of the City of Kansas in office at the time this charter goes into effect shall become and constitute the first lower house of the common council, and shall hold office until the expira-

tion of the term for which they were respectively elected (art. 2, sec. 1, p. 11); and by article 17, section 42, it is further provided, that: 'There shall be no election of members of the lower house of the common council at the general city election in the year 1890, but the term of office of the members of the common council elected at the general city election in 1889 shall be, and the same is hereby, extended and continued until the general election for city officers, to be held in the year A. D. 1892, and until their successors are elected and qualified.'

"When this charter was adopted there were ten wards in the city, each of which had two members in the council, half of them elected in April, 1888, and the others in April, 1889, for the terms of two years; so, when the new charter was adopted, these twenty members constituted the lower house until April, 1890, when those elected in 1888 went out of office, leaving one from each of the ten wards in 1889, constituting the lower house, and their terms, which were to expire in 1891, were extended by the above provision to April, 1892, until which time they were to constitute the lower house, and there was to be no election of members for that house at the general city election in 1890.

"On December 4, 1889, the council passed an ordinance extending the city limits so as to take in a larger amount of additional territory, which was divided into four additional wards, numbered respectively eleventh, twelfth, thirteenth and fourteenth wards, the original ten wards remaining the same. At the general city election in 1890, each of these wards elected a member of the lower house, and they each qualified and were acting as members of the house when the ordinance in question was voted on, and they were all present and voted for the ordinance. Besides their votes there were only six others who voted for the ordinance, to-wit, the

members from the second, fourth, fifth, eighth, ninth and tenth wards.

"The ordinance in question provided for paving Eleventh street without a petition of the property-owners, which the charter provides may be done if it be unanimously recommended by the board of public works. 'And the common council shall by ordinance order such work to be done, by the vote of two-thirds of the members elect of each house.' Charter, art. 9, sec. 2, p. 98. 'And if each house shall before or on the day it finally votes on the passage of such ordinance find and declare by a vote of two-thirds of the members elect of each house that such ordinance has been published according to law; that the street is used and occupied for business purposes, and that the work has been unanimously recommended by the board of public works.' Sec. 5.

"The ordinance in question had only six votes in the lower house, unless the votes of those claiming to be members from the eleventh, twelfth, thirteenth and fourteenth wards are counted, and the plaintiff contends that they ought not be counted because as a matter of law the territory composing said wards was never legally brought within the corporate limits of Kansas City, and was subsequently decided by the supreme court in *City of Westport v. Kansas City*, 103 Mo. 141."

From a judgment in defendant's favor plaintiff has appealed.

The point in the case may now be thus stated: Should the ordinance of September 6, 1890 (providing for this street improvement), and of course the tax bills issued thereon, be held void, because there were present, participating in the proceedings of the lower house of the common council, the four members elected from the annexed territory, which annexation was subse-

quently judicially declared illegal; and but for the votes of these members the ordinance failed of its passage?

The circuit court decided this question for the defendant and declined to decree the tax bills void; and, after a careful consideration of the very able and learned briefs and argument of counsel, we hold that decision correct, and will affirm the judgment. These four councilmen, whose acts are assailed with such force by plaintiff's counsel, though not *de jure* component parts of the city council, must yet, according to controlling authorities, be held officers *de facto*, and their acts as such, in a case like this, be entitled to the same weight as those of officers *de jure*.

The definition of an eminent English judge is often repeated in the books: "An officer *de facto* is no other than he who has the reputation of being such, and yet is not a good officer in point of law." Or, as more fully put by BUTLER, C. J., in perhaps the ablest opinion on the subject in this country: "An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons." *State v. Carroll*, 38 Conn. 449.

But, contends plaintiff's counsel, in an argument of much logical force, there can be no *officer de facto* unless there exists, to start with, an office *de jure*. And candor compels the admission, that if this case should be forced to determination on the apparent weight of authority—untrammeled by controlling precedents, and regardless too of manifest hardship and injustice—I should, speaking for myself, write here a reversal rather than an affirmance, and that too on the ground just stated.

But the distinction thus urged by plaintiff's coun-

sel is not, by the latest holding of our supreme court, declared the invariable test. In *Adams v. Lindell*, 5 Mo. App. 197, the St. Louis Court of Appeals in an able and elaborate opinion by HAYDEN, J., attacked the doctrine once announced by Judge DILLON in his work on municipal corporations (vol. 1 [4 Ed.] sec. 276), and held there might be a *de facto officer* where there was not a *de jure office*. And the supreme court, in the same case (72 Mo. 198), not only affirms the decision of the St. Louis court, but expressly adopts its opinion *in toto*. So then this opinion, as it appears in 5 Mo. App., we regard as well that of our supreme court as it is that of the court at St. Louis.

The case of *Adams v. Lindell* was this: Suit on a special tax bill issued in pursuance of an ordinance of the city council of St. Louis after the legal adoption of the new charter (and by which the city council had been abolished), though, at the time the ordinance was passed, it was generally thought—the scheme and charter had been defeated, and the officers of the old municipal government were holding on, as they thought, rightfully. Subsequently, however, it was judicially determined that the scheme and charter had carried, that the new city government was, under the law, the rightful one, and that the council who passed the ordinance for the improvement (and on account of which the tax bill was issued) were then holding offices which in law had been abolished. *Yet* the acts of this council (defunct as it was under the law) were upheld and on the ground too that such acts came under the *de facto* rule, though the office of councilman had been at law abolished. The court, in that case, practically denied the doctrine asserted by Judge DILLON, and which too had been announced in *In re Snyder*, 64 Mo. 58, to-wit, that there could not be in any event a *de facto* officer in the absence of a *de jure* office. In rea-

soning on the subject the court uses this argumentative language: "Where the office legally exists, and the officer is merely a *de facto* officer, there is a violation of law. The officer not being legally such, his acts are, apart from the principle of validation, of no legal effect; but if to this state of things we superadd the element of non-existence of the office, what essential difference can this make? The question is as to the validity of the acts of a certain man, claiming to be a public officer. If those acts are invalid, they certainly cannot be made more invalid by the addition of another quantity. 'Contrary to law' and 'invalid' do not admit of degrees of comparison. The act of the so-called officer being thus contrary to law (as he has no right to the office) the *de facto* principle is applied, and thus an otherwise void act is validated, *not because of any character or quality attached to the so-called officer or his office*, but because this is necessary to preserve the rights of third persons and keep up the organization of society. The rule is based merely on policy, and its origin and historical development show that it is founded in comparative necessity." The judge further says, that "it is evident that the necessity which creates the rule of validation may exist in precisely the same way and degree *where there is no legal office* as where there is merely *no legal officer;* and it is further evident that to apply the principle to cases where there is no legal office is taking no new or further step; for, as above said, the act being already invalid, it cannot be any more than invalid where there is no legal office. Why, then, should the rule suddenly halt, when both logic and necessity require it to proceed?" The rule is rested rather on the color of right appearing in the acting officer, and not upon any difference between a *de facto* and *de jure* office. The acts of a mere usurper are not validated, for the "apparent circumstances of

color or reputation leading men to suppose he is a legal officer" do not exist.

While now, as already intimated, I regard *Adams v. Lindell* as an innovation or modification of the rule announced by a majority of the decided cases, I cheerfully advise that it be followed in the determination of the case at hand. Few cases, I imagine, will ever arise where a wise public policy and proper sense of justice will be better served than by adopting the *de facto* rule here. A contrary holding would be most disastrous in its results. If the courts should proclaim the invalidity of all such acts of the city council whilst the same was by the common understanding composed of fourteen members—four more than should have been—by strict legal right, such a course would tend not only to disorganize the municipal government but to seriously wrong those who had taken contracts and expended money on the faith of the apparent condition of things. We are pleased that the law is not so helpless under such difficulties.

Judgment affirmed. All concur.